1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

| | |
|---|---|
| MAKAH INDIAN TRIBE, | CASE NO. 2:24-cv-157 |
| Plaintiff, | REMAND ORDER |
| v. | |
| EXXON MOBIL CORPORATION et al., | |
| Defendants. | |

| | |
|---|---|
| SHOALWATER BAY INDIAN TRIBE, | CASE NO. 2:24-cv-158 |
| Plaintiff, | |
| v. | |
| EXXON MOBIL CORPORATION et al., | |
| Defendants. | |

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

## 1.  INTRODUCTION

The question presented is straightforward: whether this Court possesses federal-question jurisdiction over state-law public-nuisance and failure-to-warn claims brought by Indian tribes against fossil fuel companies for climate change-related harms. The Makah Indian Tribe and Shoalwater Bay Indian Tribe

1

2

3

4

(together, "Tribes") filed separate actions in Washington state court, asserting claims for public nuisance and failure to warn under Washington law.[1] Defendants removed the cases to federal court, and the Tribes moved to remand. *Makah Lawsuit*, Dkt. No. 61; *Shoalwater Lawsuit*, Dkt. No. 60.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

In recent years, the Ninth Circuit has repeatedly held that federal courts lack removal jurisdiction over state-law claims brought by sovereign entities against fossil fuel companies for climate change-related harms—including in cases involving public nuisance and failure-to-warn claims against these very same defendants.[2] Defendants attempt to distinguish this body of authority by arguing that the plaintiffs' status as Indian tribes limits their right to bring state-law claims in state court. Defendants contend that because Indian tribes derive their right to possess land from federal law, via treaties and the like, all claims by tribal plaintiffs alleging injury to tribal lands arise under federal law. Defendants also argue that because the federal government funds healthcare for tribal citizens, "it is the federal government—not [tribes]—that ultimately suffers injury when healthcare services are provided to tribal members injured by tortfeasors." Dkt. No. 1 at 12.

19

20

21

[1] Except where otherwise noted, all docket citations in this Order refer to the docket in *Makah Indian Tribe v. Exxon Mobil Corporation et al.*, Case No. 2:24-cv-00157-JNW ("*Makah Lawsuit*"). Citations to the docket in *Shoalwater Bay Indian Tribe v. Exxon Mobil Corporation et al.*, Case No. 2:24-CV-0158-JNW ("*Shoalwater Lawsuit*") are expressly marked as such.

22

23

[2] *See Cnty. of San Mateo v. Chevron Corp.*, 32 F.4th 733 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 1797 (2023); *City of Oakland v. BP PLC*, 969 F.3d 895 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 2776 (2021); *City & Cnty. of Honolulu v. Sunoco LP*, 39 F.4th 1101 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 1795 (2023).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Our federal system respects the sovereignty of both states and tribes. The well-pleaded complaint rule reinforces this structure by allowing plaintiffs, as the architects of their claims, to "avoid federal jurisdiction by exclusive reliance on state law." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987). The Tribes' claims neither assert aboriginal title under federal common law, nor present substantial and disputed federal questions whose resolution in federal court would preserve the congressionally approved balance of federal and state judicial responsibilities. In other words, federal jurisdiction is absent here. To hold otherwise would elevate form over substance and improperly federalize state-law claims just because the plaintiffs are Indian tribes.

The motion to remand is granted.

## 2. BACKGROUND[3]

Plaintiffs Makah Indian Tribe and Shoalwater Bay Indian Tribe are federally recognized sovereign Native Nations occupying ancestral lands and waters in the State of Washington. *See* Dkt. No. 1-1 ¶ 2.1; *Shoalwater Lawsuit*, Dkt. No. 1-1 ¶ 2.1. Defendants Exxon Mobil Corporation, ExxonMobil Oil Corporation, BP PLC, BP America, Inc., Chevron Corporation, Chevron USA, Inc., Shell PLC, Shell Oil

---

[3] Attacks on subject-matter jurisdiction may be facial or factual. The Tribes mount a facial attack on Defendants' removal, arguing the facts in the Notice of Removal, even if true, don't establish federal jurisdiction. *See generally* Dkt. No. 61. Thus, in deciding this motion to remand, the Court assumes the facts alleged in the Notice of Removal are true. *See Leite v. Crane Co.*, 749 F.3d 1117, 1121–22 (9th Cir. 2014). This approach is sound since the Notice merely summarizes the Tribes' complaints and since the Court's ultimate task here is to determine whether the allegations in the complaints' support federal jurisdiction.

REMAND ORDER - 3

Company, Phillips 66, Phillips 66 Company, ConocoPhillips, and ConocoPhillips Company are multinational oil and gas companies that produce, promote, market, and sell fossil fuel products worldwide, including in Washington. Dkt. No. 1-1 ¶ 2.2.

In December 2023, in separate but largely similar lawsuits, the Tribes sued Defendants in King County Superior Court. Dkt. No. 1-1; *Shoalwater Lawsuit*, Dkt. No. 1-1. In each lawsuit, the Tribes brought two state-law causes of action: Public Nuisance (RCW 7.48) and Failure to Warn (Washington Products Liability Act, RCW 7.72). *Id.* In short, they allege that Defendants carried out a decades-long misinformation campaign to conceal the harmful environmental effects of fossil fuel extraction and combustion from public view; in so doing, they contributed to climate change, which has led to coastal erosion, soil degradation, wildfires, flooding, extreme heat, drought, ocean acidification, extreme precipitation, diminished air quality, and expanded pathogen and pest ranges—all of which plague the Tribes' lands. *Id.* As a result, the Tribes have had to "invest[] heavily in . . . adaption and mitigation strategies," such as "planning for and relocating housing . . . to higher ground, planning for and moving governmental infrastructure and services to higher ground, and planning for the redesign and/or relocation of reservation roads." *Id.* ¶ 4.188. According to the Tribes, climate change-related harms have also affected their public health, increasing the incidence of heat stroke, dehydration, allergen exposure, chronic obstructive pulmonary disease, cardiovascular disease, cancer, and respiratory distress among tribal citizens. *Id.* ¶ 4.187(h) As relief, the Tribes seek, among other things, compensatory damages and the creation of abatement funds to cover remediation and adaptation measures. *Id.* ¶¶ 6.2, 6.3.

1      On February 6, 2024, Defendants removed both cases from state to federal

2  court, arguing that the Tribes' claims, even though pled under state law, arise

3  under federal law and therefore give rise to federal jurisdiction under 28 U.S.C. §§

4  1331, 1362, and 1441(a). Dkt. No. 1; *Shoalwater Lawsuit*, Dkt. No. 1. On March 19,

5  2024, the Court granted a stipulated motion by all parties in both lawsuits

6  authorizing consolidated briefing on the Tribes' motions to remand. Dkt. No. 60;

7  *Shoalwater Lawsuit*, Dkt. No. 59. On March 25, 2024, the Tribes filed their

8  consolidated motion to remand, seeking to return both cases to King County

9  Superior Court. Dkt. No. 61; *Shoalwater Lawsuit*, Dkt. No. 60.

## 3.  DISCUSSION

### 3.1    Legal Standard.

      A defendant may remove a civil action from state court to federal court only if

the plaintiff could have originally filed the action in federal court. *Caterpillar*, 482

U.S. at 392 (citing 28 U.S.C. § 1441(a)). The removing party bears the burden of

establishing federal jurisdiction. *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir.

1992). Courts apply a "strong presumption" against removal, and "[f]ederal

jurisdiction must be rejected if there is any doubt as to the right of removal in the

first instance." *Id.* If the district court lacks subject-matter jurisdiction, the case

must be remanded. 28 U.S.C. § 1447(c).

      When, as here, removal is based on federal-question jurisdiction, the action

must "aris[e] under the Constitution, laws, or treaties of the United States." 28

U.S.C. §§ 1331, 1362. Federal-question jurisdiction is governed by the "well-pleaded

complaint rule," which provides that federal-question jurisdiction exists only when a federal question appears on the face of the plaintiff's properly pleaded complaint. *Caterpillar*, 482 U.S. at 392. A plaintiff, as "[architect] of the claim," may avoid federal jurisdiction by pleading only state-law claims, even when federal claims might also be available. *Id*. The mere presence of a federal defense, including preemption, does not establish federal-question jurisdiction. *Id.* at 393.

There are two exceptions to the well-pleaded complaint rule. First, under the complete-preemption doctrine, a defendant may remove a case to federal court when a "federal law not only preempts a state-law cause of action, but also substitutes an exclusive federal cause of action in its place." *Hansen v. Grp. Health Coop.*, 902 F.3d 1051, 1057 (9th Cir. 2018). "It stands to reason that if a federal cause of action completely preempts a state cause of action, any complaint that comes within the scope of the federal cause of action necessarily 'arises under' federal law." *Id*. (cleaned up).

Second, under the *Grable* doctrine, "federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 568 U.S. 251, 258 (2013) (citing *Grable*, 545 U.S. at 314). "All four requirements must be met for federal jurisdiction to be proper." *City of Oakland v. BP PLC*, 969 F.3d 895, 904–5 (9th Cir. 2020).

1

2

3

Defendants argue that both exceptions are met here—that the Tribes' claims are completely preempted and that the conditions for *Grable* jurisdiction are satisfied.

4

5

**3.2    The body of federal common law recognized in *Oneida* does not completely preempt the Tribes' claims, even assuming it could have complete-preemptive effect.**

6

7

8

9

10

11

12

Defendants argue that the Tribes' claims are completely preempted by the body of federal common law that the Supreme Court recognized in *Oneida Indian Nation of New York State v. Cnty. of Oneida*, 414 U.S. 661 (1974) ("*Oneida I*") and *Cnty. of Oneida v. Oneida Indian Nation of New York State*, 470 U.S. 226 (1985) ("*Oneida II*").[4] More generally, Defendants contend that any tribal claim seeking damages for injuries to tribal lands is governed exclusively by federal law. Dkt. No. 75 at 12–14.

13

14

15

16

17

18

19

20

21

In *Oneida I*, the Oneida tribes sued two state counties in federal court to eject them from tribal lands. *Oneida I*, 414 U.S. at 663–665. The Oneidas claimed that federal treaties from the eighteenth century had recognized their aboriginal title (their pre-colonial rights to the land) and granted them possessory rights to the disputed territory; and that any later attempts to transfer the lands violated the Indian Nonintercourse Act. *Id.*; *see* 25 U.S.C. § 177 (codifying the principle that a sovereign act is required to extinguish aboriginal title and thus that a conveyance without the sovereign's consent is void ab initio). The district court dismissed the Oneidas' claims for lack of jurisdiction, finding that the ejectment claim, despite

22

23

---

[4] The Court refers to *Oneida I* and *Oneida II*, collectively, as "*Oneida*."

1    implicating federal treaties, arose under state law. *Oneida I*, 414 U.S. at 663. The

2    Court of Appeals affirmed the dismissal, holding that the Oneidas' claim "shatters

3    on the rock of the 'well-pleaded complaint' rule." *Id.* But the Supreme Court

4    reversed. The Court reasoned that "the right to possession itself is claimed to arise

5    under federal law," and it held that "[g]iven the nature and source of the possessory

6    rights of Indian tribes to their aboriginal lands, particularly when confirmed by

7    treaty, it is plain that the complaint asserted a controversy arising under the

8    Constitution, laws, or treaties of the United States within the meaning of both §

9    1331 and § 1362." *Id.* at 666–67.

10        In *Oneida II*, the parties returned to the Supreme Court to address a new

11   argument raised by the defendants on remand: that even if the district court had

12   jurisdiction over the Oneidas' claim, it was a state-law claim, and the Oneidas

13   lacked a federal-law cause of action to pursue their possessory interest. *Oneida II*,

14   470 U.S. at 233. The Supreme Court again sided with the Oneidas, holding that

15   federal common law provides Indian Tribes with a "right to sue to enforce their

16   aboriginal land rights." *Id.* at 235. Thus, the *Oneida* holdings, taken together,

17   established that tribal governments can bring possessory land claims based on

18   aboriginal title under federal common law in federal court.

19        Defendants cite multiple persuasive authorities, including Supreme Court

20   case law, characterizing *Oneida* as a complete-preemption holding. *See, e.g.*,

21   *Caterpillar*, 482 U.S. at 396 n.8 (summarizing *Oneida* as holding that the Oneidas'

22   claims were "completely pre-empted"); *Franchise Tax Bd. of State of Cal. v. Constr.*

23   *Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 23 n.25 (1983) (describing *Oneida* as of

"similar effect" to complete preemption); *K2 Am. Corp. v. Roland Oil & Gas, LLC*, 653 F.3d 1024, 1030 (9th Cir. 2011) ("Although *Oneida I* did not speak in terms of complete preemption, the Court has since characterized the decision as holding that a 'state-law complaint that alleges a present right to possession of Indian tribal lands necessarily "asserts a present right to possession under federal law," and is thus completely pre-empted and arises under federal law.'") (quoting *Caterpillar*, 482 U.S. at 393 n.8); *Coeur d'Alene Tribe v. Hawks*, 933 F.3d 1052, 1057 (9th Cir. 2019) (quoting *Franchise Tax Bd.*, 463 U.S. at 23 n.25); *Carney v. Washington*, 551 F. Supp. 3d 1042, 1051 (W.D. Wash. 2021) (interpreting *Oneida* as "an example of one of the few areas of federal law where preemption converts a state-law claim into a federal one for the purpose of establishing jurisdiction").

But the Tribes argue that these statements are mere dicta, and that the body of federal common law recognized in *Oneida* does not possess the power of complete preemption. They contend that *Oneida I*'s holding "is better understood today as applying the well-pleaded complaint rule exception that has since been synthesized in *Grable*[.]" Dkt. No. 61 at 21. Their opposition rests on their more general position that only federal statutory law, not federal common law, can exert complete-preemptive power. *Id.* at 20.

They have a point. The Supreme Court and Ninth Circuit have consistently described complete preemption as requiring congressional intent expressed through federal statute. *See Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 66 (1987) (complete preemption exists where "Congress has clearly manifested an intent to make causes of action within the scope of [a given federal statute] removable to federal court");

*Oakland*, 969 F.3d at 906 ("complete preemption . . . exists when Congress . . . intended to displace a state-law cause of action . . . and . . . provided a substitute cause of action"); *Cnty. of San Mateo v. Chevron Corp.*, 32 F.4th 733, 748 (9th Cir. 2022). "[C]omplete preemption is 'rare.'" *Hansen*, 902 F.3d at 1057 (quoting *Retail Prop. Tr. v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 947 (9th Cir. 2014)). So rare, in fact, that the Supreme Court has found complete preemption in only three instances, all involving federal statutes. *Oakland*, 969 F.3d at 905. More recent Supreme Court precedent reinforces the view that complete preemption requires statutory grounding. *See Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 8 (2003) (noting that in the instances when the Court found complete preemption, "the federal statutes at issue provided the exclusive cause of action for the claim asserted and also set forth procedures and remedies governing that cause of action").

Other circuits have reached the same conclusion. *See, e.g.*, *Minnesota v. Am. Petroleum Inst.*, 63 F.4th 703, 710 (8th Cir. 2023) ("Because Congress has not acted, the presence of federal common law does not express Congressional intent of any kind—much less intent to completely displace any particular state-law claim."); *Bd. of Cnty. Comm'rs of Boulder Cnty. V. Suncor Energy (U.S.A.) Inc.*, 25 F.4th 1238, 1262 (10th Cir. 2022) ("Because federal common law is created by the judiciary—not Congress—Congress has not 'clearly manifested an intent' that the federal common law for transboundary pollution will completely preempt state law.").

Thus, this Court is not persuaded that judge-made federal common law, absent clear congressional direction, can exert the extraordinary preemptive force

necessary to convert state-law claims into federal ones for jurisdictional purposes. Defendants have shown, at most, ambiguities about the preemptive effect of federal common law in *Oneida* and its progeny—ambiguities that should be resolved in favor of tribal sovereignty, which includes the freedom to pursue remedies in state court when tribes so choose. *See White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 144 (1980) (stating that "[a]mbiguities in federal law" are to be "construed generously" to "comport with… [tribal] sovereignty and with the federal policy of encouraging tribal independence"); *Three Affiliated Tribes of Fort Berthold Rsrv. v. Wold Eng'g, P.C.*, 467 U.S. 138, 148–49 (1984) (reasoning that tribal autonomy is bolstered when tribes are permitted to bring claims in state court "to seek relief against a non-Indian concerning a claim arising in Indian country").

Ultimately, however, this Court need not resolve whether the body of federal common law recognized in *Oneida* completely preempts certain state-law claims. For, even if does, the Court finds that the Tribes' claims are distinguishable, as explained below.

### 3.2.1 Even if the body of federal common law recognized in *Oneida* completely preempts certain state-law claims, it does not completely preempt the Tribes' claims here.

Even if federal common law could completely preempt state law in some cases, the *Oneida* cases do not establish a federal common-law cause of action that would displace the Tribes' specific state-law claims here.

The *Oneida* cases recognized a federal common-law right for tribes to sue for violations of aboriginal title. *See Oneida II*, 470 U.S. at 235–36 ("Numerous

decisions of this Court prior to *Oneida I* recognized at least implicitly that Indians have a federal common-law right to sue to enforce their aboriginal land rights."). This right allows tribes to bring claims to vindicate possessory rights, such as ejectment, trespass, and accounting, where the right to possession itself—based on aboriginal title—is an essential element of the claim.

The Tribes' claims, by contrast, do not assert violations of aboriginal title or require establishing such title as an element. The Tribes bring public-nuisance and failure-to-warn claims, which do not turn on proving any right to exclusive possession or any disputed question of tribal title. Indeed, the Washington Supreme Court has held that public-nuisance claims can be based on either interference with property rights or threats to public health and safety. *Animal Legal Def. Fund v. Olympic Game Farm, Inc.*, 1 Wash. 3d 925, 937 (2023).[5]

Defendants' interpretation of *Oneida* would create an unbounded set of federal common-law claims for any tort affecting tribal lands—an outcome at odds

---

[5] Defendants try to collapse the distinction between possessory land claims and claims asserting injury to land by arguing that injuries to land necessarily imperil possessory land rights. Dkt. No. 75 at 24 (characterizing this distinction as "cramped" and "myopic"). To this end, they invoke the Ninth Circuit's dicta in *Owens Valley* (an opinion that was withdrawn) stating that "where a tribe seeks damages from a non-Indian for… irreparable injury to the land… federal jurisdiction exists because the Indian right of possession itself is at stake." *Owens Valley*, 185 F.3d at 1033 n.4; *see also County of Mono*, 2021 WL 3185478, at *4 (relying on *Owens Valley*). The Court is not persuaded. A claim such as ejectment requires proof of a plaintiff's possessory right to land as a prima facie element. *See Bar K Land Co. v. Webb*, 864 P.2d 435, 437 (1993) ("Ejectment is a remedy for one who, claiming a paramount title, is out of possession."). Such a claim is meaningfully distinct from, say, a products-liability claim alleging that an unreasonably dangerous product caused injury to a plaintiff's land—especially where, as here, the plaintiff's title to that land is not in dispute.

1   with fundamental limitations on federal common law. As *Erie* established, federal

2   courts are not general common-law courts and do not possess a general power to

3   develop their own rules of decision. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

4   Federal common law exists only where state law cannot be applied. *City of*

5   *Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 313 n.7 (1981).

6          The Ninth Circuit has consistently read *Oneida* narrowly. In *Skokomish*

7   *Indian Tribe v. United States*, 410 F.3d 506 (9th Cir. 2005), the court considered

8   claims brought by the Skokomish Tribe alleging that a hydroelectric project caused

9   harm to their lands and fisheries. *Id.* at 509–16. Regarding the tribe's state-law

10  claims, including trespass and nuisance, the Ninth Circuit did not consider or

11  suggest that those claims might be completely preempted under *Oneida. See id.* And

12  regarding the tribe's federal claim alleging harm to treaty-based fishing rights, the

13  court found *Oneida* "inapposite," holding that *Oneida* recognized only claims for

14  "unlawful possession of land" based on "aboriginal possessory rights in land." *Id.* at

15  514. Similarly, in *K2 Am. Corp.*, the Ninth Circuit rejected an argument that

16  *Oneida* "generally applies to 'disputes involving trust lands,'" limiting *Oneida*

17  instead to possessory claims based on aboriginal title. 653 F.3d at 1029–31. These

18  decisions confirm that *Oneida* recognized only a narrow body of federal common law

19  governing possessory land claims, not all claims involving tribal lands.

20         This conclusion is fortified when we assume, as the Court does here, that the

21  body of federal common law recognized in *Oneida* exerts complete-preemptive

22  power. For complete preemption "substitutes an exclusive federal cause of action in

23  [a state-law cause of action's] place." *Hansen*, 902 F.3d at 1057. But Defendants

1    have not identified a federal cause of action that vindicates the same basic right or

2    interest as the Tribes' state law public nuisance[6]  and failure to warn[7] claims. If

3    federal law provides no substitute cause of action, the plaintiff is left with "no claim

4    at all." *See id.* This cannot happen.

5          To be sure, Defendants cite many cases indicating that federal-question

6    jurisdiction exists over claims for damages to tribal land, but they are

7    distinguishable. *Cnty. of Mono v. Liberty Utilities Calpeco Elec., LLC*, 2021 WL

8    3185478 (C.D. Cal. May 6, 2021), for instance, involved trespass claims directly

9    implicating tribal possessory rights. And the Tenth Circuit cases Defendants cite,

10   *Mescalero Apache Tribe v. Burgett Floral Co.*, 503 F.2d 336 (10th Cir. 1974), and

11   *Pueblo of Isleta ex rel. Lucero v. Universal Constructors, Inc.*, 570 F.2d 300 (10th

12   Cir. 1978), similarly involved claims directly addressing possessory rights or

13   physical invasion of tribal lands. These cases are not controlling and, in any event,

14   involve claims not present here.

15   ───────────────

16   [6] Under Washington law, nuisance is defined as:

17          unlawfully doing an act, or omitting to perform a duty, which act or
          omission either annoys, injures or endangers the comfort, repose, health
18        or safety of others, offends decency, or unlawfully interferes with,
          obstructs or tends to obstruct, or render dangerous for passage, any lake
19        or navigable river, bay, stream, canal or basin, or any public park,
          square, street or highway; or in any way renders other persons insecure
20        in life, or in the use of property

21   RCW 7.48.120. A public, as opposed to private, nuisance is one that "affects equally
     the rights of an entire community or neighborhood[.]" RCW 7.48.130.

22   [7] Under the Washington Products Liability Act, persons harmed by products that
     are not reasonably safe can bring actions against manufacturers and sellers for
23   failing to provide adequate warnings or instructions. *See* RCW 7.72.030–040.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Taking a step back, the Tribes' claims are not in fact reducible to injury to land. The Tribes also assert injury to the safety, health, security, and comfort of their citizens. *See* Dkt. No. 1-1 ¶¶ 5.4, 5.15. Even if, as Defendants argue, *Oneida* did authorize federal jurisdiction over claims alleging harms to tribal lands, that extension of federal jurisdiction would not reach claims brought by tribal governments in their *parens patriae* capacity alleging harms to the safety, health, security, and comfort of tribal citizens.[8] The Court concludes that the rights the Tribes seek to vindicate here—the rights to be free from unreasonably dangerous products, from public nuisances, and from the various harms these torts inflict—are creatures of Washington law, not federal law.

Thus, even if the Court construed *Oneida* as creating a body of federal common law that completely preempts some state-law claims, it does not completely preempt the Tribes' claims, for the Tribes' claims simply cannot be "recharacterized as . . .federal claims." *See Hansen*, 902 F.3d at 1057.

**3.3    Because Plaintiffs' claims do not necessarily raise any substantial and disputed federal issue whose resolution in federal court would preserve the federal-state balance approved by Congress, the Tribes' state-law claims do not arise under federal law.**

The next question before the Court is whether the Tribes' claims for public nuisance and failure to warn fall within that "slim category" of state-law claims that arise under federal law for jurisdictional purposes. *Merrill Lynch, Pierce,*

---

[8] In a separate argument, Defendants contend that harms to the health of tribal citizens do not inflict injury-in-fact on tribal governments because the federal government is responsible to pay for the costs of tribal healthcare. The Court addresses, and rejects, this argument below. *See infra* § 3.3.2.

*Fenner & Smith Inc. v. Manning*, 578 U.S. 374, 385 (2016). The Court's analysis proceeds from *Grable*, in which the Supreme Court established that a state-law claim arises under federal law only when it presents a federal issue that is (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disturbing the congressionally approved balance of federal and state judicial responsibilities. *See Grable*, 545 U.S. at 514; *see also Cnty. of San Mateo*, 32 F.4th at 746–47.

*Grable* itself illustrates the doctrine's proper application. There, when the Internal Revenue Service seized the plaintiff's real property to satisfy a tax delinquency and sold it to a buyer, the plaintiff filed a quiet title action in state court arguing the buyer's title was invalid because the IRS had failed to give the plaintiff proper notice under federal statute before seizing the property. *Grable*, 545 U.S. at 310. The defendant removed the action to federal court and the plaintiff moved to remand. *Id.* On appeal, the Supreme Court held that the case belonged in federal court because whether proper notice occurred "within the meaning of the federal statute" constituted "an essential element of [the plaintiff's] quiet title claim," and because this federal question was both disputed and central to the case. *Id.* at 315.

Defendants offer two theories for *Grable* jurisdiction. They contend that the Tribes' claims necessarily raise issues about federally derived tribal land rights, and that the claims implicate federal questions about tribal healthcare funding. Dkt. No. 75 at 25–30. Neither theory satisfies the *Grable* factors.

### 3.3.1   Defendants' argument that the Tribes' claims raise federal questions about tribal land rights fails the *Grable* test.

As for their first theory, Defendants argue that the Tribes' state-law claims necessarily raise substantial and disputed federal issues about tribal land rights. Dkt. No. 75 at 26–28. They observe that the Tribes allege harms to land interests established by federal treaty or executive order, and that Washington nuisance law requires showing property injury or interference. Dkt. No. 75 at 22 (citing *Animal Legal Def. Fund v. Olympic Game Farm, Inc.*, 533 P.3d 1172, 1172–74 (Wash. 2023)). This connection to federal property rights, they suggest, creates federal jurisdiction.

This argument tumbles at the first *Grable* factor. The Tribes' claims do not require them to prove their possessory rights as an essential element. *See supra* § 3.2.1. Nuisance claims under Washington law may proceed based on interference with property rights or threats to public health and safety, without necessarily implicating federal land rights. *Olympic Game Farm*, 533 P.3d at 1172–74. The Tribes' claims do not turn on the scope or nature of their federally derived land rights.

Even if the claims implicated federal issues about tribal lands (which they do not), these issues fail *Grable*'s "actually disputed" requirement. *See* 545 U.S. at 308. No party contests the Tribes' property interests or rights. As the Tribes explain, "the validity of their possession of their lands and resources or the status of those lands and resources under any federal statute, regulation, or treaty is simply not at issue." Dkt. No. 76 at 19. The Tribes' claims neither require them "to establish

aboriginal title" nor allege or show that "treaty rights have been violated." Dkt. No. 61 at 23. Without any genuine controversy over the Tribes' federal property rights, the second *Grable* factor is not met here.

The third *Grable* factor—substantiality—is also lacking. Even if the Tribes' property rights were somehow disputed, such questions would be fact-specific to these cases rather than presenting the kind of substantial federal issue that *Grable* demands. Under *Grable*, a "substantial" issue is one that is important "to the federal system as a whole"—for example, because it presents "substantial questions as to the interpretation or validity of a federal statute" or is "both dispositive of the case and would be controlling in numerous other cases." *Oakland*, 969 F.3d at 905 (internal quotation marks omitted). Any dispute over the Tribe's land rights would be "fact-bound and situation-specific," not presenting the type of issue that meets *Grable*'s substantiality requirement. *Id.*

The district court cases Defendants cite in support of *Grable* jurisdiction— *Carney v. Washington*, 551 F. Supp. 3d 1042 (W.D. Wash. 2021), and *Gila River Indian Cmty. v. Cranford*, 459 F. Supp. 3d 1246 (D. Ariz. 2020)—only illuminate why *Grable* jurisdiction is inappropriate here. In both cases, treaty-based tribal rights formed the central controversy. *Carney* concerned a disputed property boundary where a non-Indian landowner's claims directly challenged a tribe's treaty-based rights to certain tidelands. 551 F. Supp. 3d at 1046–48. *Cranford* involved a tribe seeking to prevent upstream landowners from diverting water in violation of the tribe's treaty-based water rights. 459 F. Supp. 3d at 1248–50. Both

1    cases necessarily raised substantial and disputed issues of federal treaty

2    interpretation.

3        By contrast, this case involves no dispute over the scope of tribal land rights

4    or treaties.

### 3.3.2    Defendants' argument that the Tribes' claims raise federal questions about tribal healthcare also fail the *Grable* test.

7        Defendants' second theory—that the Tribes' healthcare cost allegations

8    create federal questions—similarly fails to satisfy the *Grable* factors.

9        Defendants argue that because tribal healthcare is federally funded, the

10   Tribes' claims necessarily implicate substantial federal questions about whether

11   they may recover for costs "borne ultimately by the federal government." Dkt. No.

12   75 at 29.

13       To support this argument, Defendants rely on *Acoma Pueblo v. Am. Tobacco

14   Co.*, No. CIV 99-1049M/WWD, 2001 WL 37125252 (D.N.M. Feb. 20, 2001). There,

15   several tribes brought state-law claims in state court against tobacco companies for

16   tortiously concealing the health risks of smoking. *Id.* at *1. The defendants removed

17   to federal court, arguing "that whether or not Plaintiffs have a right to recover

18   money expended by the Indian Health Service on Plaintiffs' behalf depends on the

19   interpretation, construction, application, and effect of the Indian Health Service

20   subrogation statute and the Medical Care Recovery Act." *Id.* at *2 (cleaned up). In

21   denying the plaintiff's motion for remand, the district court found that the plaintiffs

22   could not establish injury-in-fact without first addressing the Indian Health Care

23

1    Act and other, related federal statutes to determine whether the tribal plaintiffs,

2    rather than the federal government, bore the costs of the harms asserted. *Id.* at *7.

3        *Acoma Pueblo* was decided before *Grable*, so its persuasive value is severely

4    undercut. It did not consider, as is now required under *Grable*, whether the federal

5    issue presented by the plaintiffs' claims was even in dispute. *See Gunn*, 568 U.S. at

6    258 (referring to the pre-*Grable* case law on federal-question jurisdiction over state-

7    law claims as a "canvas look[ing] like one that Jackson Pollock got to first"). In any

8    case, *Acoma Pueblo* is distinguishable. There, the court's finding of removal

9    jurisdiction followed from its conclusion that injury-in-fact—a necessary element of

10   the plaintiffs' prima facie case—"[could not] be established without an

11   interpretation of federal law." 2001 WL 37125252, at *7. This was true, according to

12   the court, because the only cognizable damages asserted in the complaint, at least

13   arguably under federal law, were borne by a non-party.

14       Here, the Tribes do not allege only health-based injuries: they also assert, for

15   example, that climate change has forced them to "invest[ ] heavily in . . . adaption

16   and mitigation strategies" such as "planning for and relocating housing . . .  to

17   higher ground" and "planning for the redesign and/or relocation of reservation

18   roads." Dkt. No. 1-1 ¶ 4.188. So even if healthcare funding implicates federal law,

19   which the Court need not decide, the Tribes can establish injury without reference

20   to the federal healthcare regime.

21       In other words, the issue of who pays for tribal healthcare under federal law

22   is not "necessarily raised." *See Cnty. of San Mateo*, 32 F.4th at 746. It represents, at

23   most, a potential defense rather than an essential element of the Tribes' claims.

And "a case may *not* be removed to federal court on the basis of a federal defense." *Caterpillar*, 482 U.S. at 393 (emphasis in original).

### 3.3.3 Exercising federal jurisdiction over the Tribes' state-law claims would disrupt the congressionally approved balance of federal and state judicial responsibilities.

Neither of Defendants' theories—premised on tribal land rights or tribal healthcare funding—satisfy the fourth *Grable* factor, which requires that federal jurisdiction not disturb the "congressionally approved balance of federal and state judicial responsibilities." *See* 545 U.S. at 314. This Court maintains a "deeply felt and traditional reluctance" to "expand the jurisdiction of federal courts through a broad reading of jurisdictional statutes." *Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 379 (1959). State courts remain "presumptively competent" to handle cases that only *implicate* federal issues, such as this one. *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990). And it is "less troubling for a state court to consider [such issues] than to lose all ability to adjudicate a suit raising only state-law causes of action." *Manning*, 578 U.S. at 392. That Indian tribes bring these claims does not alter this principle, as the Supreme Court "repeatedly has approved the exercise of jurisdiction by state courts over claims by Indians against non-Indians, even when those claims arose in Indian country." *Three Affiliated Tribes*, 467 U.S. at 148.

As architects of their complaint, the Tribes may pursue their state-law remedies in state court.

## 4. CONCLUSION

In sum, the Court FINDS that it lacks removal jurisdiction over the Tribes' Public Nuisance (RCW 7.48) and Failure to Warn (RCW 7.72) claims. Thus, the Court GRANTS the consolidated motion to remand, *Makah Lawsuit*, Dkt. No. 61, *Shoalwater Lawsuit*, Dkt. No. 60, and REMANDS the Tribes' lawsuits to the King County Superior Court of the State of Washington for further proceedings.

Dated this 26th day of March, 2025.

Jamal N. Whitehead
United States District Judge